# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) <br> ) Docket no. 2:18-cr-00144-GZS |
| ARTHUR MILES, | ) <br> ) <br> ) |
| Defendant. | ) <br> ) |

**ORDER ON AMENDED MOTION TO SUPPRESS**

Before the Court is Defendant Arthur Miles' Amended Motion to Suppress (ECF No. 49). The Court held an evidentiary hearing on this Motion on July 2, 2019. Having considered the evidence and arguments before it, the Court DENIES the Motion for the reasons explained herein.

**I.   FACTUAL FINDINGS**

On December 12, 2017, Maine State Trooper Thomas Pappas worked a patrol on the Maine Turnpike. At approximately 10:33 p.m., Trooper Pappas observed a gray Infiniti driving southbound in light traffic near mile marker fifty. Driving conditions were poor due to sleet, rain, and patches of ice on the road, and Pappas estimated that the car was driving about thirty miles per hour. Pappas first encountered the car as it was operating in the right lane of the two-lane highway but saw it switch to the left lane before mile marker forty-nine. The car continued in the left lane for about two miles while Pappas trailed behind it. As Pappas did so, he ran the vehicle's license plate and found that it was registered to an Indigo Wilkerson of Dorchester, Massachusetts. During this two-mile stretch, the car passed a sign that read "Keep Right Except to Pass" but remained in

the left lane without overtaking any vehicles. Once the Infiniti reached mile marker forty-eight, Pappas stopped it for operating in the left lane without passing.

Pappas departed his cruiser and approached the Infiniti on the passenger side. Once the window was down, he noted that there were two occupants: a male driver and a female passenger. He also smelled the odor of burning marijuana and observed a bottle of champagne in the back seat. Pappas requested license, registration, and insurance, which prompted the driver to explain that he was driving because the passenger was fatigued. The passenger provided Pappas with a driver's license identifying her as Indigo Wilkerson. Upon being asked if he had a license, the driver responded that he did not. Instead, he provided Pappas with identification showing that his name was Arthur Miles. Miles then volunteered that he and Wilkerson had just come from Sea 40, a restaurant in Lewiston, Maine. Pappas asked if they drove to Lewiston just for dinner and Miles responded that they had visited friends. With all of this in mind, Pappas asked Miles to "hop out" of the car and instructed Wilkerson to remain inside.

Standing near the trunk of the Infiniti, Pappas inquired about the status of Miles' license and Miles indicated that it was suspended. Pappas also asked Miles if he was on probation or parole and if he had ever been arrested. Miles stated that he was on probation for violating a restraining order and that he had previously been arrested for murder. In response, Pappas queried "you got anything on ya?" To which Miles replied "no, sir, you can search me, sir." Pappas then searched Miles by patting him down, lifting his sweatshirt slightly, and examining the contents of his pockets. One of Miles' pockets contained a large wad of cash, which Pappas inspected and replaced. Pappas continued to question Miles by asking if he had probation search conditions, who the car belonged to, and what happened with the murder charge. Miles stated that he did not have search conditions, that he "beat" the murder charge, and that Wilkerson owned the car.

2

Pappas then asked who Miles' probation officer ("PO") was and whether Miles was allowed to be outside of Massachusetts. Miles identified his PO as Jill Riordan and stated that he was not supposed to be out of state.

After that, Pappas returned to his cruiser and requested that dispatch run records checks on both Miles and Wilkerson. While he was waiting to hear back, Pappas called Miles over to the passenger window and proceeded to question him about his activities that day. Miles stated that he and Wilkerson had been in Maine for three or four hours, had visited his friends Derek, Jah, and Bless, and had gone to Sea 40. Recognizing those names from prior drug trafficking investigations, Pappas inquired how Miles knew those people. Miles indicated that he grew up with them. Pappas expressed skepticism in Miles' story by noting that there "ain't a fucking thing to do in Lewiston" and that people seldom drive so far in icy conditions. Miles responded that the storm had caught him by surprise and that the weather was better near Boston. Around that time, Officer Angela Porter arrived on scene and began speaking with Wilkerson. Pappas remained with Miles and, through further questions, learned that Miles was carrying approximately $1,500 in cash and that Miles and Wilkerson had purchased the car earlier that day.

Dispatch eventually radioed that it had sent Pappas the records search results, that Wilkerson's had come back negative, and that Miles' had been "re-transmitted." Pappas asked dispatch to contact Miles' PO and then raised the topic of employment with Miles. Speaking in an increasingly agitated tone, Miles informed Pappas that he was in construction, had not reported to work in three or four months, and that Wilkerson worked at a bank. Soon thereafter, Officer Porter approached the cruiser and interjected with a few questions for Miles. Pappas then instructed Miles to place his hands on the hood of the cruiser and Porter relayed Wilkerson's story to Pappas. By Wilkerson's account, she and Miles had purchased the Infiniti that day, driven to

Lewiston, and had not met with anyone else while they were there. Upon hearing this, Pappas called Miles back to the window and attempted to clarify his version of events. Miles stated that he had gone to Sea 40 with friends and that Wilkerson had not joined them.

After telling Miles to put his hands back on the hood, Pappas informed Officer Porter that he was still unable to view the results of the records searches. He reached back out to dispatch, which advised that it had sent the results again. At that point, Pappas learned that Miles had been arrested in Maine ten days earlier and had agreed to state bail conditions. Those conditions stated, among other things, that Miles could not use or possess alcohol or illegal drugs and that he was subject to searches of his residence, vehicle, or person on "articulable suspicion." This prompted Pappas to probe Miles regarding his use of marijuana and the circumstances of the Maine arrest. About thirty minutes into the stop, Pappas placed Miles in handcuffs and detected the odor of alcohol on Miles' breath.[1] Dispatch logs indicate that there were up to four officers present at the scene by that point: Pappas, Porter, Elgin Physic, and John Darcy.

With Miles secured, Pappas proceeded to speak with Wilkerson. As relevant here, Wilkerson told Pappas that Miles had purchased the Infiniti for her in cash, she had gone with Miles to Sea 40, the restaurant had been closed when they arrived, and she had been with Miles all evening. Thereafter, Pappas searched the Infiniti. He discovered a bottle of champagne in the back seat and a baggie of what appeared to be oxycodone pills in a center console vent.

## II.    DISCUSSION

Defendant seeks suppression of all evidence flowing from three alleged violations of his Fourth Amendment rights: (1) an illegal stop; (2) unlawful custodial interrogation; and (3) a

---

[1] The Court notes that Pappas continued to question Miles after placing him in handcuffs and before providing him with *Miranda* warnings. However, the Court need not address the lawfulness of these questions because the Government has indicated that it will not seek to introduce Miles' responses at trial.

4

warrantless vehicle search outside any exception to the warrant requirement of the Fourth Amendment. The Court addresses each of these grounds for suppression in turn.

### A. Initial Stop

Defendant first avers that the stop constituted an unreasonable seizure because his left lane operation did not violate Maine law.[2] This argument is misguided. The Fourth Amendment applies to traffic stops, but it requires only that an officer act on "reasonable suspicion of unlawful conduct," not that such conduct occur. United States v. Jenkins, 680 F.3d 101, 104 (1st Cir. 2012). Reasonable suspicion entails "a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal citations and quotations omitted). Such suspicion may be grounded in a mistake of fact or law, so long as that mistake is "*objectively* reasonable." Heien v. North Carolina, 135 S. Ct. 530, 539 (2014). Here, notwithstanding the applicable traffic laws, it was reasonable for Pappas to believe—as any officer or motorist would—that the "Keep Right Except to Pass" sign was an enforceable instruction.[3] See United States v. Blackburn, No. 01-CR-86-H, 2002 WL 32693714, at *2 (N.D. Okla. Feb. 20, 2002) (finding that officer reasonably relied on speed limit sign in conducting traffic stop even though sign was inaccurate). Defendant's failure to comply with the sign thus provided Pappas with a "particularized and objective basis" to execute the traffic stop. Arvizu, 534 U.S. at 277.

### B. Interrogation

Defendant next contends that his statements following Pappas' exit request should be suppressed as the product of un-*Mirandized* custodial interrogation. In view of all the facts, the

---

[2] Defendant contends that because the speed limit was only sixty miles per hour where Pappas observed him, 99-420 C.M.R. ch. 1, § 1, his operation in the left lane without passing was legal. See 29-A M.R.S.A. § 2052(6) (stating that drivers must use right lane except to pass where speed limit is sixty-five miles per hour or more).

[3] Although the Court does not base its holding on this conclusion, Pappas' belief that the sign was enforceable appears to have been correct. See 29-A M.R.S.A. § 2057 ("[a]n operator shall obey a traffic-control device, unless otherwise directed by a law enforcement officer"); 29-A M.R.S.A. § 101(84) (stating that a sign is a traffic-control device).

5

Court concludes that Defendant was not in custody until Pappas placed him in handcuffs. Any statement prior to that point is therefore admissible.

The Fifth Amendment requires suppression of "incriminating statements obtained during custodial interrogation" without prior *Miranda* warnings. Minnesota v. Murphy, 465 U.S. 420, 430 (1984). Routine traffic stops are not inherently custodial. Berkemer v. McCarty, 468 U.S. 420, 439-440 (1984). Instead, they are akin to investigative *Terry* stops, which only become custodial where there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001) (internal citations and quotations omitted). Assessing whether a stop rises to this level requires an objective analysis of "all the circumstances surrounding the interrogation." United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996). "Relevant circumstances include 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" Id. (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)).

On balance, these factors demonstrate that Defendant was not in custody for most of the stop. First, the entire interaction occurred within the "neutral" surroundings of a public highway. United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999). Second, "the number of officers present . . . was not overwhelming" especially where only two of four even spoke to Defendant. United States v. Infante, 701 F.3d 386, 397 (1st Cir. 2012); see United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011) (finding no custody where four officers responded to scene but "only" two questioned the defendant). Third, Defendant was not "meaningful[ly]" restrained until Pappas placed him in handcuffs. Hughes, 640 F.3d at 436. It is well-established that a stop does not become custodial merely because a traveler is not permitted to "walk away from an interrogating officer." Ventura, 85 F.3d at 712. Though Pappas' exit request, consented-to search, and hand-

6

related instructions may have signaled that Defendant was not free to leave, those actions did not restrain Defendant to the same degree as a formal arrest.[4] See Trueber, 238 F.3d at 93-94 (holding that pat-down following exit order with weapon drawn did not create de facto arrest); United States v. Streifel, 781 F.2d 953, 959 (1st Cir. 1986) (holding stop non-custodial where officer told suspects they could not leave until another officer arrived). Fourth, neither the duration nor the character of the pre-handcuffing interrogation was oppressive. The thirty-minute time frame was brief and Pappas' questioning—if rude at times—was generally designed to address his suspicions of wrongdoing. See United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005) (holding stop of "slightly over" thirty minutes non-custodial); Masse, 816 F.2d at 809 (holding stop non-custodial where questioning was "brief" and intended to "dispel" or "confirm" officers' suspicions); see also United States v. Lanni, 951 F.2d 440, 443 (1st Cir. 1991) (declining to find custody despite "tense" and skeptical questioning). Thus, prior to Pappas securing Defendant in handcuffs, Defendant's interaction with the officers was non-custodial.[5]

### C. Vehicle Search

Defendant lastly contends that Pappas' search of the Infiniti violated the warrant requirement of the Fourth Amendment. This argument is easily dispatched. Not only did

---

[4] To the extent Defendant argues that Pappas' search of his person was unlawful, the Court disagrees. "A warrantless search does not offend the Fourth Amendment when it is properly circumscribed and stands on . . . voluntary consent." United States v. Brake, 666 F.3d 800, 806 (1st Cir. 2011). The evidence demonstrates that Defendant provided voluntary consent to a body search when, unsolicited by Pappas, he stated "you can search me, sir." See United States v. Chhien, 266 F.3d 1, 7 (1st Cir. 2001) (internal citations and quotations omitted) ("[c]onsent is voluntary if it is the product of an essentially free and unconstrained choice"). Moreover, as Defendant did not limit the scope of the search or protest as Pappas carried it out, a "reasonable person [would] have understood" Defendant's consent to extend to a visual inspection of his waistband and a search of his pockets. United States v. Chaney, 647 F.3d 401, 406 (1st Cir. 2011) (internal citations and quotations omitted); see United States v. Lisbon, No. CRIM. WDQ-14-0089, 2014 WL 3672887, at *5 (D. Md. July 22, 2014) (holding that the defendant consented to a search of his pockets "[b]y raising his hands and telling the officer that he could 'look' at [the defendant's] person").

[5] The Court also notes that even if Pappas obtained Defendant's post-handcuffing statements in violation of *Miranda*, the evidence procured after those statements is still admissible. The record reflects that the officers obtained Wilkerson's statements to Pappas and the items in the car without "exploitation" of Defendant's post-handcuffing statements. Wong Sun v. United States, 371 U.S. 471, 488 (1963) (internal citation omitted).

Defendant's bail conditions justify the search, but the search also fell within the warrant requirement's automobile exception. Starting with the bail conditions, the First Circuit has held that courts should give "force and effect" to the plain language of state bail conditions that permit warrantless searches. United States v. Gates, 709 F.3d 58, 64 (1st Cir. 2013). The bail conditions in this case permitted officers to search Defendant's vehicle based on "articulable suspicion" that he had either possessed or consumed alcohol. In the Court's view, Pappas acquired such suspicion by smelling alcohol on Defendant's breath and observing a bottle of champagne in the Infiniti. Thus, Defendant's bail conditions "independently justified" the vehicle search. Id.

Notwithstanding Defendant's bail conditions, Pappas' vehicle search was valid pursuant to the so-called "automobile exception." United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (internal citations and quotations omitted). Under that rule, police are permitted to conduct warrantless vehicle searches based on probable cause. Id. The probable cause "standard is satisfied when the totality of the circumstances create a fair probability that . . . evidence of a crime will be found" in the car to be searched. Id. (internal citations and quotations omitted). Here, Pappas' pre-search investigation revealed numerous factors suggestive of illegal drug activity including: Defendant's access to large sums of cash incompatible with his work history, his increasingly agitated demeanor, his interaction with suspected drug dealers earlier that night, he and Wilkerson's inconsistent stories, and the implausibility of their reasons for driving several hours in a winter storm. See United States v. Dion, 859 F.3d 114, 132-133 (1st Cir. 2017) (explaining that nervousness, conflicting stories, and strange explanations for travel are relevant to probable cause determination); United States v. Burgos, 254 F.3d 8, 15 (1st Cir. 2001) (noting that "large sums of unexplained cash" are admissible to demonstrate "an individual's involvement in illegal drug activities"); United States v. Reyes, 225 F.3d 71, 76 (1st Cir. 2000) (including the defendant's

interaction with "suspected drug dealers" in probable cause calculus).  Viewed together, these facts created a "fair probability" that Pappas would find evidence of illegal drug activity in the car. Silva, 742 F.3d at 7 (internal citations and quotations omitted).

### III. CONCLUSION

For the foregoing reasons, Defendant's Amended Motion to Suppress (ECF No. 49) is DENIED.

SO ORDERED.

                                                /s/ George Z. Singal  
                                                United States District Judge

Dated this 17th day of July, 2019.